DAVID STEWART, PERMANENT TRUSTEE OF JOHN L. AND WILLIAM L. HAMMOND, *vs.* UNION BANK OF MARYLAND AND JOHN P. McCORMICK.—*December* 1848.

It is for the legislature and not for the courts to judge, what shall be, at any particular period, the policy of the insolvent system. The business of courts is faithfully to interpret the laws, without any regard to the private notions of the judges touching the policy of this or that provision.

Prior to the act of 1834, ch. 293, payments *eo nomine*, by an insolvent debtor, no matter what his views or expectations might be, were not declared to be fraudulent or void.

The acts of 1812, ch. 77, and 1816, ch. 21, though avoiding many acts done by an insolvent, yet do not include in the number an actual payment of money, *bona fide* due by him.

In this case it was HELD, that the payment of a debt, in June 1832, by parties at that time in failing circumstances, and who, in October of the same year, applied for the benefit of the insolvent laws, was not void under the insolvent system as it then existed.

APPEAL from the Court of Chancery.

The original bill in this case, was filed on the 7th of July 1834, by the appellant, *Stewart,* as permanent trustee of *John L. & William L. Hammond,* insolvent debtors, against the *Union Bank of Maryland.* It charges that said insolvents, before their application, as partners in trade, became indebted to the *Union Bank of Maryland* for money borrowed, in the sum of $5000, for which, on the 21st of February 1832, they gave their note signed in their partnership name, payable to the bank, by its corporate name, at sixty days; that becoming embarrassed in their circumstances, and insolvent, they were unable to meet this note, at its maturity, and having dissolved partnership, they gave a new note on the 24th of April 1832, in their individual names, payable to the cashier of the bank, at twenty-eight days: that their condition of insolvency continuing, until the new note matured, they paid it, with a view and under an expectation of being or becoming insolvent debtors, and with intent to give to the bank an undue and improper preference over their other creditors; and prays for a decree, compelling the bank to pay over said sum of $5000 to the complainant, as trustee, to be distributed among the creditors of the insolvents.

The answer of the bank, filed on the 3rd of November 1844, states that the loan of the $5000 was made to the *Hammonds,* upon a pledge of the stock of the bank, made by one *James McCormick,* in pursuance of an agreement to that effect; that, when the last note fell due, (22nd and 25th of May 1832,) it was not paid by either of the parties to it, until the 25th of June following, when said *McCormick* paid the same, and respondents released the stock which had been pledged for its payment, and delivered up the note to him.

An amended bill was then filed, making *McCormick* a party, and charging that if he did make the payment, as stated in the answer of the bank, he was furnished with the means for that purpose, by the *Hammonds,* at a period, when they had a

view, or were under an expectation, of being or becoming insolvent debtors, and with intent thereby, to give said *McCormick* an undue and improper preference.

The answer of *McCormick*, filed on the 14th of July 1835, admits that the money with which he paid the bank and relieved his stock, which had been hypothecated as security for the said note, was placed in his hands by the *Hammonds* for that pupose, two days before he made the payment, but avers that he had no knowledge of the business or engagements of the *Hammonds*, or who were their creditors, at the time of their application for the benefit of the insolvent laws.

It was admitted, by agreement, that *John L. Hammond* petitioned for the benefit of the insolvent laws on the 15th of September 1832, and *Wm. L. Hammond* on the 15th of October 1832, and that both received their final dischaige on the 2nd of February 1833; that they filed their lists of debts due by them as partners, to an amount exceeding $40,000, and debts due to them, to the amount of $14,161.50. *William L. Hammond* died in 1838, and *McCormick* in 1841, and a bill of revivor was filed on the 5th of February 1846, against his administrator, *John P. McCormick*, which was answered by him on the 18th of July 1846.

The only witness examined under the commission, was *John L. Hammond*, one of the insolvents, sworn on the part of the complainant, who proved that the partnership was dissolved in the winter or spring of 1832, at which period he is unable to speak as to its solvency. That the firm did not expect to stop payment at the time of its dissolution, but, that being disappointed in not receiving $20,000, which *McCormick*, the father-in-law of *William L. Hammond*, had promised to loan them, their notes lay over, he thinks, on the 21st of May 1832: that tney had not available means to pay their debts, but that they had bills receivable, out of which, he understood a provision was made to pay to the *Union Bank*, the note in question. This arrangement was made by deponent, his brother *William*, their clerk, and the said *McCormick*. That deponent objected to the arrangement so made, because they expected to compound with their creditors, and he did not wish to give a

preference to one over another, but to make an equal distribution of their assets among their creditors.

The chancellor, (JOHNSON,) on the 24th of July 1847, passed a decree, dismissing the bill, from which this appeal was taken by the complainant.

The cause was argued before DORSEY, C. J., SPENCE, MAGRUDER, MARTIN and FRICK, J.

By DAVID STEWART and ALEXANDER, for the appellants, and

By T. P. SCOTT, and WM. H. COLLINS, for the appellees.

MAGRUDER, J., delivered the opinion of this court.

With all the attention we have given to the matters disclosed in this record, we can discover no ground for a reversal of the chancellor's decree.

The material facts in the case, according to our view of it, are these. The appellant is the permanent trustee of *John L. and William L. Hammond,* and in that character filed his bill of complaint in the court below, to obtain a decree, declaring to be fraudulent and void a payment of $5000, alleged in the original bill to have been made by those insolvents, to the *Union Bank of Maryland,* and by the amended bill to charge *McCormick,* (now deceased,) with this money, if the *Union Bank of Maryland* be not, (for the reasons suggested,) liable therefor.

It appears that the two insolvents were in partnership in the year 1832, when a loan of $5000 was made to them by that bank. The note originally given by them was renewed, and the latter became due 22–25 of May, of that year. It was not paid at maturity, nor until the 25th June, when the same was paid to the bank by *McCormick,* he having been furnished with the means of paying it by the drawers.

*McCormick* induced the Bank to lend the money to the *Hammonds,* but did not endorse the note. By the terms of the agreement however, into which he entered with the bank, he was to pledge stock of that institution for the same. The

note being paid off as stated in the record, this stock was released, and the note given up to *McCormick.*

This payment to the bank of the amount of its note, it is charged, was in fraud of the creditors of the insolvent, and in contravention of the intent and policy of the insolvent laws of the State. Because of this, it is insisted, that the complainant, as the trustee, is entitled to the relief which he asks. The chancellor said that he is not. In so saying did he err?

This court has repeatedly had occasion to say that, according to the common law, a debtor has a right to prefer one creditor to others. It cannot then be pretended that the payment, admitted in these proceedings to have been made, is void, unless there be in our insolvent laws some clause which makes it so. We must take care in examining this case, to bear it in mind, that it is for the legislature, and not for the court to judge, what shall be at any particular period, what is called the policy of the insolvent system. Provisions whereby to guard against fraud, in the acts of insolvents have varied from time to time, and none are ignorant that even intelligent and honest men, differ in this matter. Our province is *jus dicere,* (of the case under consideration,) and not *jus facere.* The court cannot create the offence, nor proportion the punishment to the offence, when the law makes the act done, to be an offence. A correct judge takes it for granted, that the wisdom of the law, (its constitutionality not being questioned,) is superior to his wisdom, and in deciding any question, especially one arising under our insolvent laws, (the provisions of which have been so frequently changed,) must take care to ascertain what the legislature, in its wisdom, made the law at the time when the act complained of was done, and not at any other time.

These remarks are intended as a brief answer to very many of the arguments which we heard pending the discussion of this case, all of which, (although entitled to grave consideration, when urged in the legislative hall,) seem out of place when addressed to this *forum.*

A few sentences, borrowed from *Justice Story,* in his work on equity jurisprudence, will furnish an answer to some other remarks which have been occasionally introduced. "It is not

upon the feelings which a delicate and honorable man must experience, nor upon any notion of discretion, to prevent a voluntary gift, or other act of man, whereby he strips himself of his property, that courts of equity have deemed themselves at liberty to interpose in cases of this sort. They do not sit, or affect to sit, in judgment upon cases as *custodes morum*, enforcing the strict rules of mortality, but they do sit to enforce what has, not inaptly, been called technical morality. Courts of equity, therefore, will not set aside an act or contract, merely because a man of more honor would not have entered into it.''

There may be, it is true, ''surrounding circumstances which ought to assist us in our judgment, but then we must not surround the case by too many circumstances; with circumstances which ought to have no influence upon our minds in settling the matters in issue.'' The question is not, of what number of unbecoming acts the defendants were guilty, but, whether in this act there was, according to the proof, any thing for which it is the duty of this court to say, that this payment to the bank, as stated, was forbidden by our insolvent laws, and because of this, the same sum is to be paid either by the bank or by *Mc-Cormick*, to the trustee, and to constitute a part of the general fund, to be distributed in just proportions among the creditors.

Now it is not, and it is presumed cannot be denied, that until the act of 1834, ch. 293, ''payments *eo nomine*, by an insolvent debtor, no matter what his views or expectations might be, were not declared fraudulent and void. It is also certain, that our courts cannot, in order to apply that act to their case, assume that law to have passed a few years sooner, or the insolvency of the *Hammonds*, and the act complained of, to have taken place a few years later, than was the case. He then who asks us to condemn the act as fraudulent, and to declare that the complainant is entitled to a decree, that the money be paid to him, must show the law, which without using the word payment, declares by a different word or phrase, the thing done (the payment of this note,) to be fraudulent and void. It is not an unreasonable belief, that this may be the only point in the very able arguments which have been made to us, in behalf of the appellants, which has not been satisfactorily demonstra-

ted. In this part of it however, there may be a defect, and possibly, this defect may have been discovered by the legislature, and have led to the act of 1836.

We all know that our insolvent laws were designed to prevent frauds and undue preferences, sometimes by depriving the insolvents of the relief which they sought, without affecting the right of the creditor who is preferred, and sometimes by making void the instrument which would secure the preference, without depriving the debtor of the relief which the insolvent system designs to give to every honest debtor, who applies for it. The question then, now is, whether there was in 1832, any act of Assembly of *Maryland,* which made void the payment here complained of, and of course entitles the complainant in this suit, to the money here in controversy ? Neither the researches of counsel, nor our recollections or labors, furnish the law which is wanted for this case.

The right to relief, it seems almost to be admitted, must be given, if given at all, by the act of 1812, ch. 77, 1st sec., and 1816, ch. 21, sec. 6. But these acts of Assembly, although they avoid many acts, when done by an insolvent, yet do not include in the number, an actual payment of money *bona fide* due by him. All deeds, conveyances, transfers, assignments and sales, of any debts, rights, or claims, with a view, and under an expectation of being or becoming an insolvent debtor, and in order to give an undue and improper preference, are declared by the act of 1812, to be null and void. The act of 1816, in declaring what acts it makes absolutely null and void, uses only the words, "all deeds, conveyances, transfers, assignments or sales of any property, real, personal or mixed, or any debts, rights or claims, with a view," &c. Now it is evident, that in neither of these acts of Assembly are payments, or any words or phrases significant thereof, to be found among the acts declared to be null and void. This may be a defect in the law. It may be as *impolitic* to allow debtors in failing circumstances to pay the debt in money, as to quiet the supposed demands of the creditors, in any of the ways forbidden. But this is a question only to be decided by the Legislature, just as to that department of the government, it may seem at

any time most for the interest and well being of the community. The business of courts is to learn that will, from the words used by the Legislature; to make it known, and to interpret it faithfully, without any regard to the private notions of the judges, touching the policy of this or that provision.

It will at once be seen, by an examination of our insolvent system, that our Legislature has acted with great caution, in forbidding acts, which, in themselves, certainly are not criminal, (the security or payment of *bona fide* debts,) and in determining under what circumstances such acts shall be deemed unlawful. According to its notions of sound state policy, it would seem, that very many acts of debtors, in failing circumstances at the time, and who expected to become, and afterwards did become applicants for the benefit of our insolvent laws, might be prohibited, while, as yet, actual payments it would be unwise to forbid. Until 1836, there is manifest, in all our insolvent laws, a reluctance to interfere with the right of the creditor to demand, threaten to sue, sue for, or collect, an honest debt—a fondness for the old law maxim, which gives a preference, *vigilantibus,* and leaves it *dormientibus,* to suffer, if loss and injury to them, be the consequence of their negligence.

Very many other points have been deliberately argued at the bar, but a decision of them is unnecessary in this case.

DECREE AFFIRMED.